Good morning, your honors. Charles Fleischman, appearing for the Plaintiff and Appellant. This is an ERISA case which involves a self-funded plan where the Planned Administrator is the employer of the Plaintiff's UPS. It's a short-term disability issue. The Plaintiff, Ms. Sherwood, was diagnosed with an objective biopsy with Hepatitis C. She was being treated for the infection with Interferon. The symptoms of Interferon are the same exact symptoms that she was complaining of, and they can't be disabling. A Dr. Zide, employed by the defendant, described the symptoms as compatible with side effects of Interferon treatment for Hepatitis C. The only issue was whether or not she was, in fact, experiencing the symptoms, and whether or not the symptoms were sufficient to prevent her from being able to do a regular occupation. And the answer was, if you didn't believe her, she laid out in detail in her appeal letters, I think there were two of them, what her symptoms were and how they affected her ability to do her job. If you didn't believe her, if there was any question of doubt as to her veracity, the employer who was the named fiduciary and who had the discretion in the self-funded plan could have gone to its own employees, who she had named as her co-workers and her supervisor, who actually. Well, perhaps she didn't name them. She named one supervisor. She named one supervisor, and she said her co-workers also. They could have gone to those people and asked, you know, how was she performing her job? Was she able to do it? There's a burden of production there. Does the administrator have to do that? Yes. Yes. If it's readily available information available to the administrator, yes, they have to do it. I don't know if there's any case law. What part of the plan says that? It is in the plan. It's in the Ninth Circuit decision. Where is that? What case law? I did look, and I couldn't find a case that said that there were. Certainly, if she had come in with statements from her co-workers, that would be one thing. But she didn't do that. All she did was say, this is what happened to me, and from which she could infer that there might be people who could confirm it. But she didn't come in with any confirming information from them. No, she didn't. But they never – she gave them – she identified them. She said her supervisor – well, one by name, and she said her co-workers. And that made – I don't know the situation. Maybe it changes every other day who the co-workers are. But certainly the supervisor was named. But she did not come in with a letter or declaration or even a statement that these people could corroborate this. Well, she said she's talked for several times about this with her supervisor. I know. But she didn't suggest anybody talk to them. She didn't come in with information from them. She didn't – I don't think it's unreasonable for her to – All right. So what case law is there that would substantiate an obligation to do that? Well, from the Ninth Circuit, we have Booten v. Lockheed. Booten? B-O-O-T-E-N v. Lockheed. B-O-O-T-O-N. I'm not sure of the spelling. It's cited in my brief. And there's also another case which – which I sent a letter to the court about. Brown versus – I'm sorry. There's also – well, there's also several other cases that say when you put a prima facie case in front of the planned administrator, the burden then shifts to the – the planned administrator to come up with evidence showing that it isn't true, substantial evidence showing that the person is not disabled. Those cases are the Lasser case, Lasser v. Rawlings-Standard, and Stuck v. Unum, both one of which I cite in my brief and one of which I identified in a letter to the court. In this case, she came up with a prima facie case. She came up with her doctor that said she's disabled. She came up with her symptoms of why they were causing her to be unable to work. She came up with the positive test showing that she did, in fact, have the infection. And the defendants agreed that – or one of the defendants' doctors agreed that the treatment that she was undergoing could cause the symptoms that were disabling her. If they wanted to have her further tested, they could have had her tested. The burden shifted to them to say, okay, well, you're not disabled because of X, Y, and Z. But they have no X, Y, and Z. All they have is a series of five doctors who say, we don't know. And I suggest that we don't know. You can always have that in every single arbitrary and capricious ERISA case. You can have doctors galore come up and go, gee, we reviewed these records. We haven't examined the patient, but we've reviewed these records. And from these records, we don't know. Go out and get some more. You can always say, go out and get some more. And again, this was – Yes. I've looked hard for some short-term disability cases. I'm sorry. I didn't hear you. I looked hard for short-term – I mean, the difference, of course, is that at least – is that there's relatively little money at stake, and the burden of coming up with the evidence can be expensive. Is there any case where I'm making any distinction, though, on that basis? I haven't been able to find anything. The closest I've ever been able to come to is this Lasser versus Reliance standard, where the defendant kept asking for more and more and more, and it wasn't from this circuit, but the court of appeals said there's a point where the burden shifts, where, you know, you just – you know, it's up to you now to come up with evidence to disprove disability. And that was also stated in Stubb versus Unum, which clearly said that once the plaintiff or the claimant makes a prima facie case that they're disabled, it's up to the defense or the plan to come up with substantial evidence to prove that – to show that they're not disabled. That didn't happen here. These people just said, no, no, no. They could have very – What she had to show she was disabled was her own diary about – and she had doctor's reports, but they were essentially based on her own self-reporting as well. Well, this is a situation that the only way you know about is she's self-reporting, unless the doctor's living with her. Right. So under those circumstances, the plan – what – is the plan's obligation at that point to submit her to what? If they wanted her to have neuropsychological testing, which is expensive, and we're only talking about short-term disability, they have the right to have her examined. They could have sent her over to be examined for neuropsychological testing. If they wanted to have a liver biopsy and she wasn't claiming that she was disabled because of the hepatitis or the liver biopsy didn't mean anything, nor did her x-rays mean anything, they could have had that done. But they could have had anything they wanted done. Okay? They have the right to do it under the plan. She could have submitted a report from a psychiatrist or psychologist, but she didn't. Well, she wasn't – she wasn't – this was a temporary condition. She wasn't going to a psychologist. She wouldn't be going to a psychologist or psychiatrist to overcome a deep-rooted psychological problem. This was a reaction to the drug. And, in fact, as soon as she got off the drug, it stopped. She went back to work. Well, they told her, if you don't come back to work, you're fired. She had to quit the treatment before it was through, and she went back to work. She's working right now. So, I mean, this isn't like something that you need treatment for a psychological problem. Everybody knows what it's from. It's from the interferon. Well, no, they can do testing to find out whether it is indeed affecting the various other functions. Well, I don't know how they – That's pretty clear, isn't it? That's what good ones do in the first place. Oh, psychiatrists? Yeah. Well, maybe they could have, but why – what's – other than to prove that the interferon is causing this reaction, which is an admitted reaction to the – But that's the question. I guess that's what they're saying, and that's the hard question in the case. Can they insist on essentially some kind of expert testimony or evidence from a psychiatrist or psychiatrist as opposed to her medical doctor with regard to what's – because really what's come down to are a series of mental reactions. We're not talking about any kind of physical reaction, really, right? There's some talk about weakness and so on, but basically we're talking about a mental reaction. Right. Right. And the question is – I mean, I guess the problem I'm having is that even if she went to a psychiatrist or a psychologist, it's still going to be based basically on what she says. Right. Well, they say neuropsychological testing, or when they send her out the letters telling her what they wanted, and when their doctors wrote the reports, their doctors wrote the reports, they always used the disjunctive or – what do they call it? Behavioral observations. Behavioral observations. Well, that's the employee – her co-workers and her supervisor. Well, neuropsychological testing doesn't depend on self-reporting necessarily, does it? No. Because they give tests and they have ways of telling whether you're playing games with the tests. So they could test and find out. It's not a question of whether she's having some concentration problems. The question is, are the concentration problems of such a degree that she cannot perform? Right. And that's exactly what that kind of testing can do. Yes, but they – And it's not. You're absolutely right. But they didn't ask for it. They asked for that or observation – behavioral observation. Okay. Well, where was the behavioral observation? She gave them the name of her supervisor and told them about the co-workers that worked with her. But she did not – but she didn't submit anything. She had no idea that these people – that UPS was unable or unwilling to contact their own employees, and that's where she got the information. And she got a phone call. I thought they told her, you must submit the information to us. Didn't they tell her that? Yes. And she responded – I got that in those letters. Yes, yes, yes. They did. And she responded with, I talked to my supervisor. And it's a lot easier for them to talk to the supervisor than for her to talk to the supervisor. I mean, he's worried about his job. You know, he wants – I'm not going to give you – I don't know that this is true. But generally speaking – I don't know this specific situation – generally speaking, it's easier for the employer to go to the employee and say, hey, what do you know about your co-employee? The question is, did they violate the terms of the plan or their fiduciary duties because it would have been easier for them and maybe a little harder for her? So they violated because it might be somewhat easier for them. That's what you're saying. I'm saying – And therefore, they were required to do it because there would have been some more ease involved. Is that right? No. I'm saying it's not even a matter of ease. It's a matter of the right thing to do. They are fiduciaries, and they owe her a duty. And one of those duties is to seek out and obtain readily available information. And that case is a Ninth Circuit decision of Booten versus – Booten's a little different animal, I do believe. Well, Booten was – yes, it's a different animal. It involved a dentist and dental work and all that. And a much more exciting set of facts. Well, it depends what – I was involved in Booten, too, but I'm just as excited about this case. Should I say egregious set of facts then? Maybe not exciting, but egregious. I think when you're talking about a short-term disability plan and all they have to do is make a phone call, I think this is just as egregious. And they just decided not to ask the question, just to ignore her identification of these people. They just decided, you know, to heck with it. And they decided that there's a new rule, as a matter of fact. And that rule is we determine what evidence is important for us to consider. And their excuse for not calling the supervisor is that that's not the kind of evidence we want to consider. And I don't think they have a right to do that. I would like to save the remainder of my time for rebuttal. Thank you. Good morning. May it please the Court. My name is Pam Heminger. I represent the appellee, UPS Flexible Benefits Plan. I'd also like to introduce my colleague, Jesse Cripps. Essentially, this case is one that's before the Court based on the arbitrary and capricious standard of review. There's no question about that. The case is before the Court after trial by the district court. This is not a summary judgment case. Therefore, the findings of fact of the district court. It's a very odd kind of bench trial in documents and so on. Yes, Your Honor. The trial of summary judgment in some ways. Well, actually, in Kerney and other cases, the Court makes a distinction between the summary judgment and a bench trial based upon the administrative record. But, indeed, it was a bench trial based upon the administrative record. That comes out of our Ninth Circuit case in Kerney, which said, no, you can't do summary judgment, but you can do a bench trial and receive all the documents if that's how the people want to present it. And so that's what we do. That's how we do it. That's exactly right, Your Honor. Sure. Nothing strange about it. We, well, except sometimes maybe we order strange things. But beyond that, that's what we do. In this case, the appellant essentially says the plan administrators abused their discretion because you should have believed the claimant's self-reported symptoms. You should have independently conducted your own investigation, gone out into the workplace, interviewed co-workers, and accepted lay opinion. And, lastly, you were required to order and have tests done rather than ask the claimant to submit evidence establishing not only the existence of disability, but the disabling condition, but also that she was unable to work. Well, how far does that go? I mean, she had a doctor. It was her doctor for a while. He submitted a set of documents of which, I mean, the first determinations by the administrator seemed to be totally wrong. They didn't seem to understand the problem. Then he submitted some more documents, and particularly this November 14th document that was the most extensive. And then they all seemed to be somewhat on the same page in terms of what the problem was. And he said that she was severely depressed and that he, and that this was the result of the interferon and that she had cognitive problems and that he recommended bed rest and that she couldn't work while she was taking the interferon. So there was medical evidence. And she, they then say, well, they want something else. They want, as I understand, so behavioral observation seems to me, neither a psychiatrist or a psychologist or an internist or any kind of doctor is really going to have behavioral observations, right? They're not going to see her on a day-to-day basis. So what was that asking for? There's certainly, Your Honor, a number of tests as were actually in the record from the peer review process. Dr. Burstein stated behavioral observations including the frequency, duration, and intensity of symptoms observed, the results of a formal mental status examination or performance-based tests of psychological functioning with standardized scores. Dr. Weinstein specifically stated no cognitive testing indicating any memory loss or poor functional ability. No documentation of significant cirrhosis or complications. Essentially what they're doing is disbelieving her self-reported symptoms, which she self-reported a great length in great detail. Well, Your Honor, self-reported symptoms by a non-medical professional are not necessarily dispositive of whether the individual is able or unable to work. But this is an unusual area because it's in an area in which it's the functioning that's the question. It's really what's going on in a day-to-day basis. And she's reported in great detail and with diaries about what's going on in a day-to-day basis. So it's not like – and we know that there is some somatic basis for this. I mean, everybody agrees that she does have hepatitis and she is taking a medication. The medication can cause exactly what she's reporting. So given all that, what's really happening is that instead of having her say how she's feeling, they want somebody to look at her and watch whether her self-reporting is consistent, is right or not. Is that really – how else could somebody corroborate her report that she can't concentrate and she's dizzy and she's emotionally upset and she can't do her work because of her emotional reactions to the medication? Those findings can be made through exactly the kind of tests that the experts indicated that they wanted that information. What kind of tests are they? They're tests, Your Honor, of functional capacity, strength, memory. There's psychological tests with respect to memory. There's standardized scales that they use when someone reports depression. Depression can be slight and clearly non-disabling. A standardized – that's still based on self-reporting, right? Somebody – I'm trying to envision it. So is the problem that he wasn't a psychiatrist? In other words, if she went into a psychiatrist and she said I'm depressed and he would have a scale and he'd say, you know, did you have this symptom? Did you have that symptom? Did you have this symptom? And he'd scale it. Is that the problem? I'm really trying to understand that. Excuse me, Your Honor. Go ahead. Medical experts know exactly what questions to ask and how to judge those responses against medical scales. But they also give standardized exams and ask questions. Like if you were faced with X, Y, and Z, what would you do, right? If you were faced with Z, what would you do? What would you say about this? What would you say about that? And they score those, do they not? That's exactly right, Your Honor. That's exactly right. I think it's very telling. If you look at the final documentation at the second level of appeal, here the claimant, her physician, and her attorney were given three opportunities to provide evidence, and there was a clear communication by the plan with respect to what they were looking for. The final documentation is an eight-page letter, and only the first paragraph even addresses her current condition. The patient has chronic active hepatitis from hepatitis C. Her medication causes severe side effects, including hemolytic anemia, although in his November letter he had said that she was no longer taking ribavirin because her hemolytic anemia had cleared up, swelling, weakness, anxiety, memory loss, and severe abdominal pain. She has been under extreme stress. There's no even statement that these symptoms, conditions, disable her from working within the meaning of the plan. To require a plan to accept the self-reported symptoms of a lay individual, in fact would probably be deemed in many cases arbitrary and capricious. The fact that a plan wants competent medical opinion with respect to the severity of self-reported symptoms, how they fit on a standardized scale with respect to ability to work, is certainly not arbitrary and capricious. What's odd about this case is that it's short-term disability benefits, and I gather she was entitled to them after, what, four days or something? I'm not sure what the eligibility period would have been. Approximately that, Your Honor. And to have done what she's being asked to do within that time period, and at the expense she's being asked to go to, usually the cases we see deal with a transition from short-term to long-term disability and the difference between them. And I understand there's no difference in the plan, or maybe in the case law, with regard to those different kinds of disability plans, but is there no inference of some measure, some proportionality between the kinds of benefits being applied for and the obligation of proof? I don't think so, Your Honor, in this case. I think the standard is the same, although in this case, as the record reflects, plaintiff had been on a long-term disability for this same condition. Plus, there's no evidence in the record that some of this evidence was not available from her treating physician. There were no medication records produced. All that was produced was very, very cursory reports essentially reiterating what plaintiff had said. Was that requested? Was anybody doubting that she was taking these medications that they said she was taking? Well, the doses certainly weren't indicated, Your Honor. If you look at the reports of the peer individuals, they point to the lack of underlying data. Further, there's no evidence in the record with respect to the cost of these tests or that they wouldn't otherwise be covered by her medical plan. To argue cost of tests is certainly to consider evidence outside the record. With respect to the contention that the plan was obligated to go into the workplace and interview a supervisor and coworker, to hold that a plan administrator has that kind of obligation would be simply to increase tremendously the cost and burden on administrators. There was no request, first of all, in this case, that that be done. This is not a case like the stump case where declarations were submitted by the claimant. This is a situation where the plaintiff reported her symptoms. And by the way, her diary entries that supposedly reflected her disabling condition were all for a time period when she was actively at work. They weren't for a period during which she contended she was disabled. No, they were for a period that she contended that she was ‑‑ her contention was that she was trying to work, but she was not succeeding in doing it because of these symptoms, and that's why she needed to go off work. Actually, Your Honor, the date of her letter was following her claim for disability. I believe, Your Honor, I can give you the ‑‑ But I'm having trouble with this argument. I mean, I understand most of the rest of what you said, but here she's trying to document the fact that she made a good faith effort to go to work despite her ‑‑ while she was on this medication and found that she couldn't work. Isn't that the best evidence that she can't work, that she can't work? Perhaps, Your Honor, if we were talking for a very short period of time, here we're talking about a period, I believe, from March through September. A pretty long period of time. Essentially, she has more documentation rather than less. The question is whether you have to rely on her own documentation, but the fact that it comes from a period that she was actually working and demonstrates that she's having a hard time working under the same medical conditions that she's currently exhibiting seems like good proof, not bad proof. It's the best proof. Well, but certainly, Your Honor, especially under an arbitrary and capricious test, it indicates that her performance was not such that she was disciplined or otherwise told that her performance was not acceptable. Having a car accident, she's losing her keys, she's blowing up at people, she's having what she regards as an inability to work in the way that she believes she ought to be working. People have their own standards, too, sometimes. I'd like to call the Court's attention to the Ninth Circuit decision in the Jordan case, which I supplied this morning. I think it's a very important case in looking at this case in that it also involved a situation in which there were self-reported symptoms of pain, a diagnosis of fibromyalgia, anxiety, and depression. In that case, the claimant, despite requests, produced only conclusory statements from her physician that she was disabled. The plan asked for additional documentation. The Court upheld the administrator's denial of benefits in that case. The district court's opinion, as cited in our brief in the Ninth Circuit, found that Judge Collins' decision was careful and well-reasoned at the district court level. One further point with respect to the argument that the ---- Kagan. Obviously, I have not had a chance to read Jordan. Does Jordan include this kind of very detailed self-reporting of her symptoms? No, it does not, Your Honor. At least the case does not reflect that. Is there any case that you know of in which we have this kind of detail in terms of her behavioral symptoms? I'm not aware of any as I stand here today, Your Honor. But, again, the volume of self-reported symptoms, it does not seem to me, goes to the ---- establishes that the plan administrator is required to accept those self-reported symptoms. Well, he may not be required to accept it. I mean, that seems right. But he may be required to, at that point, take affirmative steps to disprove them. I mean, that is to do some ---- to order ---- I mean, the records I've seen before, what happens at that juncture is they order something called a functional capacity test or something and they send someone off to somewhere. They certainly have more access to these fairly specialized kinds of occupational health people than she's likely to, to demonstrate, to do a functional capacity study. I mean, she's sort of done a functional capacity study on her own, and the question is if you're not going to believe her, do you have to do something else? She's not a medical professional, and certainly I'm not. But these are not ---- I mean, that's really the problem here. There isn't a problem of tracing, right? We know she has the illness, and we know that she's taking the medication, although there's an issue about dosage. And we know that the medication can cause these problems. So it isn't that there's a causation problem, really, although I understand you're hanging out on the dosage thing. So, therefore, the question is what are her symptoms? And the symptoms are symptoms that are inherently ---- they're subjective with some objective manifestations, but not of the kind that you're likely to see in an office. So why isn't what she's given you the best you're going to get? For the same reasons in the Jordan case, the court found that in a fibromyalgia case, which has no objective manifestations, that it was appropriate for the plan to ask for an assessment of how those symptoms affected ability to work. Here we have a situation where, in one letter, her own physician says that her disability was anticipated to last until the end of November. Then, in February, he states she continues to be ---- well, he doesn't even state that she continues to be disabled. He states only that she has the condition of hepatitis with drug complications. To require an affirmative investigation, simply because an individual self-reports symptoms of anxiety and depression, is to put a burden on the plan that the plan language does not require. The plan language gives the administrator the discretion to require documentation in the form that the plan deems necessary for plan administration. To go out and interview the supervisors, the privacy issues that that would raise to impose and to invite a plan administrator when someone makes a disability claim to interview supervisors and coworkers in the workplace, not only is it costly, but certainly implicates all kinds of privacy issues. This is not a case like Stumpf, where declarations were actually submitted. Although, even in that case, I would submit that a plan administrator is not acting arbitrarily and capriciously by asking that the individual produce functional capacity tests, see a psychologist or psychiatrist, or even have a treating physician present evidence of his analysis of her symptoms, other than simply reporting plaintiff complaints of plaintiff states. There is nothing in this record where the competent expert physician states that her condition has X symptoms and those symptoms are of sufficient severity that she is unable to work. And that doesn't seem to be right because he does list symptoms quite specifically and he says that she shouldn't be working and she should be on bed rest. In the one document that is the most descriptive, the November 14th document. Actually, Your Honor, it's a very interesting document in that his final conclusion is she should avoid the patient should avoid any stressful working circumstances. And he prescribes bed rest. You can't go to bed and go to work. And he also says bed rest. And then he, number four, he does state the patient is unable to work because of hepatitis C with multiple complications and continued toxic reaction to medical therapy. I take a lot of what you said. But in terms of whether his documentation is at least reasonably specific and reasonably directed to whether she can work, it seems to me it is. The question is whether his lack of expertise and his lack of specificity as to the particular psychiatric issues is the problem. I'd like to emphasize that this is not a case like Booten or many other cases where the plan simply issued form denial letters after form denial letters, never communicated with the claimant to state that additional documentation was required. The plan documentation was quite specific. There was ongoing communication. I'm going to interrupt you because you're almost done and I have a question. Has the parties tried to mediate this case? We have wonderful court mediators, and it occurs to me that this is a money case. It's a relatively small amount of money, I assume, because we're just talking about short-term disability. Would it make any sense for us to, which we do sometimes, delay submission of the case for a couple of weeks while you explore with our mediators whether it's worth mediating? No, Your Honor. The mediation program, the case was assessed for that and a determination was made that it would not be mediated. I don't think that this case will mediate at this point in time. I see. Thank you very much. Thank you, Your Honor. With regard to Dr. Morgulan, he specifically said at Excerpt of Record 52, this is dated September 24, 2002, at this time it is mandatory that the patient complete her course of treatment for her active hepatitis. She's able to tolerate the treatment only as a homebound patient. The treatment should be complete by the end of November. At that time, the patient should be able to return to work. Well, it wasn't complete by the end of November. Sometimes they get it wrong, doctors. But clearly he says that she cannot work while she's being treated with the interferon. But she was basically told, the clearest thing she was told was go to a psychiatrist or psychologist and come in with some more specific medical assessment of your mental circumstances. And she didn't do that. She just kept coming back at the same level of generality. So why isn't that sufficient? Okay. If you look at Excerpt of Record 45, she wasn't told that. Excerpt of Record 45 is the report from Lawrence Burstein, who I guess is a psychologist. And he wrote, In order to substantiate that Ms. Sherwood is unable to perform the core elements of her occupation from a psychological perspective, her providers would have to submit examination findings which document the presence of impairment. Examples of such findings would be behavioral observations, including frequency, duration, and intensity of symptoms observed, the results of a formal mental status examination, or performance-based tests. All right. So where are any of those? The behavioral observation, including frequency. That was her own. It says medical providers. Yes. But she said, hey, you can talk to my ‑‑ she didn't say you can talk, but she gave them a way to confirm that. But what they said they wanted was such information from a medical provider. Is that not what they said? Well, how can a medical provider give behavioral observations, you know, talk about the frequency that she's upset and all that without living with it? To some degree they can. Somebody comes into the office, you spend a couple hours with them, and you write what you see. Whether that is really pertinent to this question is another problem. But that is what they asked for. Regardless of what they asked for. You know, you have trouble understanding what behavioral observations are. I have trouble understanding it. Certainly she's got the same amount of problems. These are not explicit instructions. This is exactly what we want you to do. It's totally true that if you're a professional and somebody comes in and you spend some time with them, there are some circumstances in which you can see things. Whether this is one of them is another question. But sometimes you can. Well, I think Dr. Morgan, in his reports, he talked about all the problems that she's talking about. Now, whether he observed them himself or got it from her, I don't know. Going back to the co-employees and the supervisor, though, there is a case that says they are duty. In Palmer versus University Medical, the lady was suffering from a bad back, which was subjective complaints. The plan didn't believe her. The trial court, it's a fed sub case in Oregon. The trial judge said, hey, if you don't believe her, you could have gone to her co-employees and asked them. It was easy. It's your plan. You're the employer. Maybe that was the insurance company. They weren't even the employer. It was standard insurance. You could have gone to the employees, the co-workers with her, and asked them. You just can't disbelieve her just because you want to disbelieve her, just because, you know. This was all available to them. If they wanted her to have testing, they could have sent her for the testing. You see it happen all the time. They send people out for IMEs, functional capacity evaluations, all kinds of testing. To say to her on a small case like this, where basically she's looking for money to get through the six months until she's done with the treatment. In Palmer, though, my understanding is that she affirmatively, the plaintiff affirmatively produced information from her co-workers. No, I don't. I believe she just gave the names. I'm not sure. I don't think so. It says the opinions of her co-workers and subordinates is that she wasn't paying and was an honest woman who would not lie about her condition. Oh, okay. You may be right. Okay. You may be right on that. But it's still the same thing. They could have gone and asked. There's several other cases that say, you know, you can go and ask also. There's a. I don't. I couldn't find one, honestly. I looked hard. I believe I indicated Gaither versus Aetna. I sent the court a letter on that one. Smith versus Bowen. Well, they may have given the statements in those cases, but they point out that that information is very relevant to this issue, the credibility of the claimant with regard to her problems. And I just don't see it when you have a fiduciary duty to make sure you come up with the right decision to say, well, I'm not even going to look into this. I'm not even going to call up my own employee, the supervisor. Well, there might be issues about doing that. They would at least have to clear it with her first. Well, they didn't even try to clear it. They didn't even tell her we're not going to call these people. They didn't even write to her and say we're not interested in their opinions. There's no reason for her to have. I guess I would be. If you had submitted a. If she had sent in a letter saying these are the people who. Here's my diary. These are the people who could confirm that everything I say actually happened. Please interview them. I have any privacy interests. None of that happened. She didn't. She provided one name. She didn't ask them to talk to her. She didn't say it was OK with her for them to talk to her. She didn't suggest they talk to him. Well, why would she give the name if she didn't see if it wasn't a suggestion that they could confirm everything with their supervisor? Why would she bother to get the guy? She was just given a report of things that happened to her. She certainly didn't suggest they do that. Does she really have to? I mean, it's like you say. I was in a car accident. Joe saw it. You don't believe. What would you do? You'd go ask Joe. I mean, why else would she give the name? Ordinarily, if you have an administrative proceeding and you don't bring the person in, then it's not evidence. If you go to an administrative hearing and they say I have a coworker named Joe, but Joe doesn't show up, it's not evidence. This isn't exactly an administrative proceeding. This isn't like a hearing. This isn't. We're not sitting at a formal proceeding. These people are just sending letters back and forth to each other, reports and whatnot. The point is they had a readily available method of confirming everything she said. And they decided not only to decide not to do it, but they decided not to tell her they weren't going to do it. And they never even bothered to suggest to her, well, why don't you get those guys to give us statements? Why don't you send them? You know, she's a layperson. She doesn't know exactly what's going through their mind. She did eventually get a lawyer. I don't know if it was you or somebody else. It was me. It was me. And I had no idea. I read all this stuff. Everything's in the disjunctive. Nothing is specific until we got into court and counsel started talking. Well, they're asking you specifically for this and specifically for that. Well, I never read anything that they were asking for specifically. Everything was in the alternative, get this or that, get this or that. And at one point I sent in a whole bunch of sheets from the – that I downloaded from the Internet on interferon because I thought they were saying that there's no evidence that interferon causes these conditions in a person. So I misread everything. But now I find out when we got to court that, no, we were saying there's no evidence that interferon causes this condition in your client. You know, well, it wasn't very clear at all. And counsel keeps saying that it was as clear as a brook stream, but it was about as clear as the Yancey River. I mean, it was like mud. I'd like to say a few words about Jordan. You're about out of time, but go take a minute. You're over your time. I'm sorry. Okay, thank you. Thank you very much.
judges: Canby, Fernandez, Berzon